## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. _____** |
| **v.** | : | **DATE FILED: _____** |
| **SILVER BUCKMAN** | : | **VIOLATIONS:** |
| **VINCENT FOXWORTH** | | **18 U.S.C. § 1349 (conspiracy to commit** |
| **CYNTHIA FOXWORTH** | : | **bank fraud and wire fraud - 1 count)** |
| **DANETTE THOMAS** | | **18 U.S.C. § 1344 (bank fraud – 6 counts)** |
| **BYRON WHITE** | : | **18 U.S.C. § 1343 (wire fraud – 5 counts)** |
| **FRANKLIN BUSI** | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **Notice of Forfeiture** |

# I N D I C T M E N T

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

### INTRODUCTION

At all times material to this indictment:

1.        Beginning in or about October 2006 continuing until in or about November 2009, defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS, BYRON WHITE, and FRANKLIN BUSI, and others both known and unknown to the grand jury, devised and executed various schemes to defraud financially distressed homeowners, federally insured banks and others, and to obtain their money and property by means of materially false and fraudulent pretenses, representations, and promises.  In furtherance of their schemes, the defendants aided and abetted each other in the conspiracy that involved inducing homeowners to agree to a lease buyback program orchestrated by defendant BUCKMAN, which resulted in at least 18 fraudulent real estate sale and mortgage

financing transactions with banks and other lenders, totaling approximately $3,800,000.  As the result of the fraudulent actions of all of the defendants, a total of more than $1,500,000 was obtained, which they converted to their personal use and used to promote their ongoing fraudulent schemes.

## THE DEFENDANTS

2.      Defendant SILVER BUCKMAN owned and operated Fresh Start Financial Services ("FSFS"), located in Mount Laurel, New Jersey and was an employee of American Home Lending, located in Bellmawr, New Jersey.  Defendant BUCKMAN was also a mortgage broker for American One Mortgage ("AOM"), located in Cherry Hill, New Jersey.

3.      Defendant SILVER BUCKMAN maintained a FSFS business bank account and a Dana Capital business bank account at Wachovia Bank.

4.      Defendant VINCENT FOXWORTH had decades of experience as a real estate salesperson with Century 21 Alliance in New Jersey and was an experienced real estate investor.  He was also the father of defendant SILVER BUCKMAN and husband of defendant CYNTHIA FOXWORTH.

5.      Defendant CYNTHIA FOXWORTH was the wife of defendant VINCENT FOXWORTH and mother of defendant SILVER BUCKMAN.

6.      Defendant DANETTE THOMAS was a licensed title agent and co-owner of Trinity Insurance, Abstract and Title Agency, LLC in New Jersey.  Defendant THOMAS also operated Unique Management and Consulting Services, LLC ("Unique Mgmt."), and maintained a business account for Unique Mgmt. at Commerce Bank.  Defendant THOMAS was engaged to defendant BYRON WHITE.

2

7.     Defendant BYRON WHITE was a novice in the real estate financing business.  He was engaged to defendant DANETTE THOMAS.

8.     Defendant FRANKLIN BUSI was a business associate of defendant SILVER BUCKMAN at American Home Lending and also a mortgage broker associated with several other mortgage related companies, including Home Mortgage Direct ("HMD"); HMD Real Estate Investments LLC; HMD Financial Services LLC; Fresh Start Modifications LLC; Freedom Mortgage; and, Citizens Financial Mortgage ("CFM").  Defendant BUSI maintained a business bank account for HMD at Wachovia Bank.

## THE FINANCIAL INSTITUTION LENDERS

9.     The following were financial institutions, within the meaning of Title 18, United States Code, Section 20, whose deposits were insured by the Federal Deposit Insurance Corporation ("FDIC") and were engaged in the business of making mortgage and other loans to the public (collectively, the "Financial Institution Lenders"):

a.     Fremont Investment & Loan, FDIC certificate # 25653;

b.      First Franklin Financial, an operating subsidiary of Merrill Lynch Bank & Trust Co., FSB, a FDIC chartered bank, FDIC certificate #34571;

c.     Sovereign Bank, FDIC certificate # 57787;

d.     JP Morgan Chase Bank, N.A., FDIC certificate # 628;

e.     Wells Fargo Bank, N.A., FDIC certificate # 3511; and,

f.     EverBank, FDIC certificate # 34775.

3

**THE NON-FINANCIAL INSTITUTION LENDERS**

10.     The following entities were engaged in the business of making mortgage and other loans to the public (collectively, the "Non-Financial Institution Lenders"):

          a.     Pinnacle Financial Corporation, d/b/a Tri-Star Lending Group (Orlando, FL) ("Pinnacle");

          b.     Superior Mortgage;

          c.     Lincoln Mortgage Co.;

          d.     Countrywide Home Loans;

          e.     Freedom Mortgage; and,

          f.     Assured Lending.

The Financial Institution and Non-Financial Institution Lenders, when discussed collectively, are referred to as the "Lenders."

**BACKGROUND OF MORTGAGES AND THE LEASE BUYBACK PROGRAM**

11.     One method of financing in the United States was obtaining mortgage loans through various financial and lending institutions. Such financing included loans for the purchase of a primary residence and for rental real estate.

12.     As part of the lending process in a real estate transaction, a borrower typically completed a loan application that provided information about the amount of loan being sought, the amount of down payment the borrower would provide for the loan, the source of the down payment, the borrower's income and assets, and the borrower's creditworthiness. In the event the borrower was relying on the financial information of a co-borrower for the down payment or any other reason, the borrower was required to provide the co-borrower's information on the loan application. Financial and lending institutions relied on the information

provided on the loan application in determining whether to approve the requested real estate loan. The financial and lending institutions also relied on the fact that there was an arms' length relationship between the borrowers and the homeowners/sellers and that there were no encumbrances on the real estate to interfere with the borrowers obtaining clear title to the properties.

13.     Federal law required the use of a standard closing form (known as a HUD-1) as a statement and listing of settlement costs for federally related mortgage loans, but the form was typically used in non-federally related mortgage loans as well. When used, this statement was required to clearly itemize all charges imposed upon the borrower/buyer and all charges imposed upon the seller in connection with the closing of a real estate sale.

14.     Lenders often utilized title insurance companies to complete their real estate purchase/loan transactions, including the accurate completion of the HUD-1, and to disburse the loan funds at a settlement. Lenders provided closing instructions to title insurance companies with directives for the title agents to follow before disbursing loan proceeds. One such directive was to have the borrower execute an occupancy agreement that stated the borrower intended to occupy the property as their primary residence and to take possession of the property within 60 days.

15.     After the settlement, lenders had the ability to negate the sale if they discovered the information contained on the loan application or the HUD-1 was inaccurate or the conveyance of the property was obtained by fraud.

16.     For purposes of the lease buyback program offered by defendants SILVER BUCKMAN and FRANKLIN BUSI, these defendants targeted homeowners who had equity in their homes who were in default on their mortgages and facing foreclosure because of their

5

inability to make monthly mortgage payments to mortgage issuers.  The defendants also targeted other homeowners who were simply financially vulnerable and needed money for personal reasons.  In either case, defendants BUCKMAN and BUSI, as well as, defendants DANETTE THOMAS and BYRON WHITE fraudulently represented that they had a method to help the homeowners stay in their homes mortgage payment-free for a year, keep their homes and avoid foreclosure, or allow the homeowners to obtain money, by using part of the equity they had established during their ownership.  The solution that defendants BUCKMAN, BUSI, THOMAS and WHITE offered to the homeowners required them to enter into lease buyback or similar agreements with an "investor" who had good credit and would, together with the homeowners, share title to the homeowners' properties for a year.  The homeowners were told that they also had to enter contracts for the sale of their homes to the "investors."  After settlements on the sale of their homes, the proceeds from the sales would be placed into escrow accounts in the names of the individual homeowners.  Mortgage payments would be made from the escrow accounts with the loan proceeds by defendant BUCKMAN's company, Fresh Start Financial Services, Inc., so that the homeowners would establish a history of timely mortgage payments.  In addition, defendant BUCKMAN would provide credit repair services to the homeowners.  After a year, through defendant BUCKMAN's efforts, the homeowners would be able to refinance the mortgage on their homes with the monies that remained in their escrow accounts and remove the "investors" from the title to their homes.

17.     Defendants SILVER BUCKMAN, FRANKLIN BUSI, DANETTE THOMAS and BYRON WHITE, however, failed to provide material information to the homeowners about the particulars of how the lease buyback program worked, made affirmative misrepresentations, and omitted details about the program, including the actual cost of the lease

buyback program, the amount of money that the homeowners would receive at settlement, and what would actually be done with any equity the homeowners had in their homes.

18.     Defendant SILVER BUCKMAN recruited her parents, VINCENT FOXWORTH and CYNTHIA FOXWORTH, her uncle and aunt, D.F. and D.F., and her cousin, D.W., to be the "investors" or "straw borrowers" for purposes of the lease buyback program, in return for a fee averaging $10,000 per transaction.  Likewise, defendants BUCKMAN and FRANKLIN BUSI recruited the ex-husband of a co-worker, R.N., and defendants DANETTE THOMAS and BYRON WHITE recruited D.T., to be "straw borrowers" for purposes of the lease buyback program in return for a similar fee.

19.     Defendants SILVER BUCKMAN and FRANKLIN BUSI were the mortgage brokers for the mortgages sought by the "straw borrowers" with the Lenders.

20.     At no time did defendant SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS, BYRON THOMAS, or FRANKLIN BUSI ever disclose to the Lenders that took the "straw borrowers'" loan applications into consideration and agreed to fund the mortgage loans that: the homeowners and "borrowers" had entered into lease buyback agreements; rather than the "borrowers" relying on their assets for the down payments, closing costs, and mortgage payments, the payments would be derived from a combination of the homeowners' equity and the loan proceeds; the homeowners intended to retain an ownership interest in their properties after the settlements; or, the defendants intended to convert the homeowners' equity and loan proceeds to their own use.

**THE CONSPIRACY AND SCHEME TO DEFRAUD**

21.     Beginning in or about November 2006 continuing until in or about

November 2009, in the Eastern District of Pennsylvania, and elsewhere, defendants

**SILVER BUCKMAN,
VINCENT FOXWORTH,
CYNTHIA FOXWORTH,
DANETTE THOMAS,
BYRON WHITE, and
FRANKLIN BUSI**

knowingly and intentionally conspired and agreed with each other and others to devise a scheme

and artifice to defraud homeowners and lenders, and to obtain money and property from the

homeowners and lenders, including federally insured financial institutions, by means of

materially false and fraudulent pretenses, representations, and promises, and for the purpose of

executing and attempting to execute the scheme and artifice to defraud, transmitted and caused to

be transmitted by means of wire and radio communication in interstate commerce, certain

writings, signs, signals, pictures and sounds, which scheme and artifice is set forth below in

substance and in part, in violation of 18 U.S.C. §§ 1343 and 1344.

**OBJECT OF THE CONSPIRACY AND SCHEME TO DEFRAUD**

22.     The object of the conspiracy and scheme to defraud was to obtain money

and property from financially distressed homeowners and lenders by making materially false and

fraudulent misrepresentations.

**MANNER AND MEANS OF THE CONSPIRACY AND SCHEME TO DEFRAUD**

23.     It was part of the conspiracy and scheme to defraud that defendants

SILVER BUCKMAN and FRANKLIN BUSI solicited business from homeowners in

Pennsylvania and New Jersey who had substantial equity in their homes but were either facing

8

foreclosure because of their inability to make their monthly mortgage payments or in need of money.

24.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN, FRANKLIN BUSI, DANETTE THOMAS and BYRON WHITE fraudulently promised to help homeowners keep their homes, avoid foreclosure, repair their credit, and provide the homeowners with money they needed as part of the lease buyback program.  The defendants induced the homeowners to agree to the lease buyback program and thereby sell part of their ownership interest in their home to "investors" for a year by stating that during the course of the year, monies from the settlements would be deposited into individual escrow accounts in the homeowners' names and the newly obtained mortgage with the "investors" would be paid from the escrow accounts in order to improve the homeowners' credit rating.  The homeowners were also led to believe they could remain in their homes throughout the year and, at the end of the year, they would be able to repurchase their homes by refinancing the mortgages and use the remainder of the monies in their escrow accounts to do so.

25.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN, DANETTE THOMAS, BYRON WHITE, and FRANKLIN BUSI recruited VINCENT FOXWORTH and CYNTHIA FOXWORTH and others with good credit scores to act as "investors" or "straw borrowers" for purposes of the lease buyback program, in return for a fee averaging $10,000 to $20,000 per transaction.

26.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS, BYRON WHITE, and FRANKLIN BUSI submitted and caused to be submitted to lenders fraudulent loan applications containing materially false personal and financial

9

information about the "straw borrowers," including the "straw borrowers'" income and the misrepresentation that the source of the down payments, closing costs, and mortgage payments would be the "straw borrowers'" assets, which the defendants knew the lenders would rely upon in deciding whether to approve the loans.

27.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS, BYRON WHITE, and FRANKLIN BUSI caused the lenders to wire monies to the title companies for the settlements.  Defendants SILVER BUCKMAN, DANETTE THOMAS and FRANKLIN BUSI also caused the lenders to include payments to them in the monies wired for the settlements based on invoices that fraudulently misrepresented services provided or to be provided by these defendants.

28.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS, BYRON WHITE, and FRANKLIN BUSI caused the "straw borrowers" to falsely represent to the lenders on the HUD-1 that the "straw borrowers" had supplied the down payments for the transactions, when, in actuality, the funds for the down payments typically came from defendant SILVER BUCKMAN, who withdrew monies from her FSFS bank account and supplied the withdrawn funds to the "straw borrowers" ahead of the settlements or obtained loans from defendant VINCENT FOXWORTH and repaid him after the settlements.

29.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN and DANETTE THOMAS, the latter acting as a title agent at the time, directed homeowners to endorse disbursement checks representing the homeowners' equity after the homeowners' debts were paid off and other fees were satisfied, to enable defendant SILVER

BUCKMAN to deposit the checks into her FSFS bank account, defendant FRANKLIN BUSI to deposit into his HMD account, or defendant THOMAS to deposit into her Unique Mgmt. bank account, for their personal benefit.

30.     It was further part of the conspiracy and scheme to defraud that defendant SILVER BUCKMAN, rather than depositing the disbursement checks that represented the homeowners' equity into individual escrow accounts for the homeowners, deposited the checks into her FSFS and Dana Capital bank accounts where all of the proceeds of the settlements were commingled.  She used the majority of the proceeds to pay the fees due the "straw borrowers," the down payments on behalf of the "straw borrowers" in subsequent transactions, and her personal expenses.  She used only a fraction of the homeowners' monies toward the payment of the mortgages obtained by the "straw borrowers" for the homeowners' homes and thereby caused the loans to default.

### THE PROPERTIES

31.     It was further part of the conspiracy and scheme to defraud that defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS, BYRON WHITE, and FRANKLIN BUSI committed and caused to be committed the following acts in connection with the following properties, among others:

A.     **12 Tiffany Court, Kunkletown, PA**

(1)     On or about November 15, 2006, defendant SILVER BUCKMAN corresponded with J.L. and T.L. about the lease buyback program and convinced J.L. and T.L. to execute a lease buyback agreement and contract for the sale of their home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

(2)     On or about November 28, 2006, defendants VINCENT

11

FOXWORTH and CYNTHIA FOXWORTH completed a loan application that made no reference to the lease buyback agreement.

          (3)      On or about November 28, 2006, defendant SILVER BUCKMAN submitted the loan application to Fremont Investment & Loan (Fremont).

          (4)      On or about December 18, 2006, title insurance for the settlement was written by First American Title Insurance Company, King of Prussia, PA.

          (5)      On or about December 18, 2006, Fremont wire transferred approximately $328,500 in loan funds from California to the account of Infinity Settlement Agency of PA in Moorestown, NJ for use by defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH in the purchase of 12 Tiffany Court.

          (6)      On or about December 21, 2006 and January 5, 2007, defendant SILVER BUCKMAN deposited settlement disbursement checks representing the homeowners' equity totaling $41,500 into her FSFS bank account.  Afterwards, defendant BUCKMAN wrote a $15,000 check payable to defendant CYNTHIA FOXWORTH and only five $2,908.61 checks ($14,543.05) payable to the mortgage held by Fremont between February and June 2007.

      **B.**      **5219 N. 6th Street, Philadelphia, PA**

          (1)      In or about January 2007, defendant SILVER BUCKMAN engaged in telephone conversations with L.C. about the lease buyback program.

          (2)      On or about March 7, 2007, defendant SILVER BUCKMAN convinced L.C. to execute a lease buyback agreement and contract for the sale of her home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

          (3)      On or about April 11, 2007, defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH completed a loan application that made no reference to the lease

buyback agreement.

(4)     On or about April 11, 2007, defendant SILVER BUCKMAN submitted the loan application to First Franklin Financial, an operating subsidiary of Merrill Lynch Bank & Trust Co., FSB ("MLB&T").

(5)     On or about April 11, 2007, MLB&T wire transferred $75,784.56 in loan funds from either New Jersey or Ohio to the account of Associates Land Transfer in North Wales, PA for use by defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH in the purchase of 5219 N. 6th Street.

(6)     On or about April 11, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused the HUD-1 to falsely represent that L.C. received $55,387.45 as proceeds from the settlement and that defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH provided $20,900.49 of their own funds for the down payment and closing costs.

(7)     On or about April 12, 2007, defendant SILVER BUCKMAN forged L.C.'s signature on a $47,560.14 settlement disbursement check representing a portion of L.C.'s equity and deposited the check into defendant BUCKMAN's FSFS bank account. Afterwards, defendant BUCKMAN made nine withdrawals, totaling $6,599.12, to pay the mortgage on L.C.'s property between June 2007 and April 2008.

(8)     On or about June 2008, defendant SILVER BUCKMAN wrote and mailed a letter to L.C. in which she falsely represented that the escrow of funds from the settlement had "depleted."

**C.     64 Exton Lane, Willingboro, NJ**

(1)     In or about early March 2007, defendant SILVER BUCKMAN

engaged in telephone conversations with R.W. about the lease buyback program.

(2)      On or about March 14, 2007, defendant SILVER BUCKMAN convinced R.W. and M.W. to execute a lease buyback agreement and contract for the sale of their home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

(3)      On or about April 24, 2007, defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH completed a loan application that made no reference to the lease buyback agreement.  The defendants falsely represented that they had monthly earned income of $19,500 and monthly rental income of $7,068, which included purported income from the rental of 12 Tiffany Court, Kunkletown, PA.

(4)      On or about April 24, 2007, defendant SILVER BUCKMAN submitted the loan application to Sovereign Bank.

(5)      On or about April 24, 2007, Sovereign Bank wire transferred $208,637.25 from Reading, PA to Pennsauken, NJ to the account of Trinity Insurance, Abstract & Title LLC ("Trinity") for use by defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH in the purchase of 64 Exton Lane.

(6)      On or about April 24, 2007, defendant SILVER BUCKMAN caused the withdrawal of approximately $30,000 from the FSFS bank account and made that money available to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH for the settlement.

(7)      On or about April 24, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH and DANETTE THOMAS caused the HUD-1 that would later be submitted to Sovereign Bank to falsely represent that R.W. and M.W. received $71,372.46 as proceeds from the settlement and that defendants VINCENT

14

FOXWORTH and CYNTHIA FOXWORTH provided $29,439.44 of their own funds for the down payment and closing costs.

    (8)  On or about April 24, 2007, defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH executed a "Borrower's Certification & Authorization" form and falsely certified that all of the information that they provided to Sovereign Bank was true and complete and they made no misrepresentations in the loan application or other documents or omit any pertinent information.

    (9)  On or about April 24, 2007, defendant DANETTE THOMAS falsely told R.W. and M.W. that their proceeds from the settlement would be going into an escrow account.

    (10)  On or about April 24, 2007, defendant SILVER BUCKMAN deposited a $70,789.44 settlement disbursement check representing a portion of R.W. and M.W.'s equity into defendant BUCKMAN's FSFS bank account.

    **D.**  **412 S. Browning Avenue, Somerdale, NJ**

    (1)  In or about March 2007, defendant SILVER BUCKMAN convinced L.B.F. to execute a lease buyback agreement and contract for the sale of her home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

    (2)  On or about May 8, 2007, defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH completed a loan application that made no reference to the lease buyback agreement.  The defendants falsely represented that they had liquid assets totaling $31,280 and intended to commit $21,284.74 as cash toward the purchase of 412 S. Browning Avenue.

    (3)  On or about May 8, 2007, defendant SILVER BUCKMAN

15

submitted the loan application to Pinnacle Financial Corporation ("Pinnacle").

(4)     On or about May 8, 2007, defendants SILVER BUCKMAN,

VINCENT FOXWORTH and CYNTHIA FOXWORTH caused Pinnacle to approve the loan and

wire transfer $146,624.18 from Orlando, FL to Trinity's account in New Jersey for the purchase

of 412 S. Browning Avenue.

(5)     On or about May 8, 2007, Pinnacle provided closing instructions

that stated the title agent was to accept funds:

> "<u>ONLY FROM THE BORROWER</u> AND ONLY IF DRAWN ON ONE OF THE
> SPECIFIC FINANCIAL INSTITUTIONS THAT ARE LISTED ON THE 1003
> LOAN APPLICATION . . . AND DRAWN ON THE BORROWER'S
> ACCOUNT . . . . <u>Closing Agent is instructed to notify Lender in writing prior to
> closing if any funds are to come from GIFT, GRANT, ADDITIONAL
> UNDISCLOSED LOAN PROCEEDS, INDIVIDUAL OR ENTITY OTHER
> THAN THE BORROWER(S) or any other undisclosed source.</u>

Defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH executed a certification and

falsely represented that the down payment represented the monies identified in the loan

application and all of the receipts and disbursements made on their account were true and

accurate.

(6)     On or about May 8, 2007, defendant SILVER BUCKMAN made

$16,600 and $5,000 counter withdrawals from the FSFS bank account, which withdrawals were

made possible by the deposit of $70,789.44 following the settlement on 64 Exton Lane on April

24, 2007.

(7)     On or about May 8, 2007, defendants VINCENT FOXWORTH

and CYNTHIA FOXWORTH provided a check in the amount of $16,600 and another $4,917.07

in cash at the time of the settlement.

(8)     On or about May 8, 2007, defendant SILVER BUCKMAN

16

deposited a $48,508.92 settlement disbursement check that represented the entirety of L.B.F.'s equity into defendant BUCKMAN's FSFS bank account. Afterwards, from the proceeds, defendant BUCKMAN wrote a $9,440 check payable to defendant VINCENT FOXWORTH and only seven checks, totaling $10,760.29, toward payment on the mortgage for 512 S. Browning Avenue.

        **E.**        **33 Elm Street, Salem, NJ**

        (1)        In or about May 2007, defendant SILVER BUCKMAN convinced D.P. to enter into a lease buyback agreement and contract for the sale of her home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

        (2)        In or about May 2007, defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH completed a loan application that made no reference to the lease buyback agreement. The defendants falsely represented that they had combined gross monthly income of $14,708.33. They falsely identified monthly rental income from 12 Tiffany Court, Kunkletown, PA and 5219 N. 19th Street, Philadelphia, PA. They identified liquid assets totaling $31,703 and cash available for the $15,892.55 down payment from their accounts. The application falsely stated that the source of the down payment and settlement charges would be from their checking/savings accounts and a seller assist.

        (3)        In or about May 2007, defendant SILVER BUCKMAN submitted the loan application to Wells Fargo for their approval.

        (4)        On or about May 31, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused Wells Fargo to wire transfer $125,552.51 to Trinity for the settlement on 33 Elm Street.

        (5)        On or about June 1, 2007, defendants SILVER BUCKMAN,

VINCENT FOXWORTH, CYNTHIA FOXWORTH and DANETTE THOMAS caused the HUD-1 that would later be submitted to Wells Fargo to falsely represent that D.P. received $42,751.05 as proceeds from the settlement.

(6)     On or about June 1, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused the HUD-1 that would later be submitted to Wells Fargo to falsely represent that defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH provided $19,936.98 of their own funds for the down payment and closing costs, when, in fact, defendant SILVER BUCKMAN withdrew $19,936.98 from the FSFS bank account on June 1, 2007, which represented the commingled proceeds of earlier lease buyback transactions.

(7)     On or about June 1, 2007, defendant SILVER BUCKMAN, following the settlement, deposited the $42,751.05 made payable to D.P. into the FSFS bank account, rather than an escrow account.

(8)     On or about June 13, 2007, defendant SILVER BUCKMAN wrote a $10,000 check payable from the FSFS bank account to defendant VINCENT FOXWORTH with a notation that read "33 Elm Street, Salem, NJ" and on July 6, 2007, defendant BUCKMAN wrote a $19,874 check from the FSFS bank account to payable to defendant VINCENT FOXWORTH with the same notation.  Later, defendant BUCKMAN made nine mortgage payments from the FSFS bank account, each equal to approximately $1,330 for a total of approximately $11,918.  Some of the remaining commingled monies were used for other down payments, mortgage payments and unrelated personal and business expenses.

      **F.**     **6016 Keystone Street, Philadelphia, PA**

(1)     Beginning in or about October 2006, defendant SILVER

BUCKMAN engaged in a series of telephone conversations with W.N. about the lease buyback program.

    (2)  On or about March 10, 2007, defendant SILVER BUCKMAN convinced W.N. to enter into a lease buyback agreement and contract for the sale of his home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

    (3)  In or about May 2007, defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH completed a loan application that made no reference to the lease buyback agreement.

    (3)  In or about May 2007, defendant SILVER BUCKMAN submitted the loan application to Pinnacle for their approval.

    (4)  On or about June 29, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused Pinnacle to wire transfer monies from Orlando, FL to the account of Associates Land Transfer in North Wales, PA for use by defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH in the purchase of 6016 Keystone Street.

    (5)  On June 1, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused the HUD-1 that would later be submitted to Pinnacle to falsely represent that defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH paid a down payment of $27,348.34 from their own funds and would occupy 6016 Keystone Street within 60 days.  The defendants also caused the HUD-1 to falsely represent that W.N. received $98,575.06 as proceeds from the settlement.

    (6)  On or about June 1, 2007, defendant SILVER BUCKMAN caused the title agent at Associates Land Transfer to prepare two settlement disbursement checks

payable to W.N., one in the amount of $40,000 and a second in the amount of $59,091.09.

(7)     On or about July 3, 2007, defendant SILVER BUCKMAN

deposited a $59,091.09 check made payable to W.N. and bearing the forged signature of W.N.

into her FSFS bank account.  In the days following the deposit, defendant BUCKMAN used the

proceeds of the check to fund a $10,000 check made payable to defendants VINCENT

FOXWORTH and CYNTHIA FOXWORTH, debit purchases for personal reasons, and mortgage

payments for other lease buyback transactions.  Defendant BUCKMAN made only six payments

for the mortgage on 6016 Keystone Street, which ended on May 1, 2008.

### G.     16 Whiting Street, Berlin, NJ

(1)     In or about April 2007, defendant BYRON WHITE engaged in

conversations with W.C., who was facing foreclosure, about refinancing his existing mortgage

and cashing out some of his equity.

(2)     In or about April 2007, defendant BYRON WHITE introduced

W.C. to defendant DANETTE THOMAS, who offered the lease buyback program to W.C. and

promised that W.C. would receive "tens of thousands" of dollars at the settlement.

(3)     In or about April 2007, defendants DANETTE THOMAS and

BYRON WHITE recruited D.T. to be a "straw borrower" as part of the lease buyback program

by offering to pay D.T. $20,000.  The defendants told D.T. that she did not need to provide any

documentations or monies.

(4)     In or about May 2007, defendant SILVER BUCKMAN completed

a loan application that made no mention of the lease buyback program, but falsely represented

that D.T. intended to occupy 16 Whiting Street as her primary residence, the source of the

$19,439.50 down payment would be from D.T.'s checking account, and the seller would pay

$9,600 toward the borrower's closing costs.

(5)     In or about July 2007, defendants SILVER BUCKMAN,

DANETTE THOMAS and BYRON WHITE submitted and caused the submission of the loan

application containing the fraudulent misrepresentations to JP Morgan Chase Bank, N.A.

("JPMCB").

(6)     On or about July 9, 2007, defendant SILVER BUCKMAN

withdrew approximately $15,000 from the FSFS bank account for use as the down payment at

the time of the settlement on 16 Whiting Street.

(7)     On or about July 25, 2007, defendant DANETTE THOMAS did

not disclose to JPMCB that she would be the title agent for the settlement on 16 Whiting Street

and was the owner of Unique Mgmt.

(8)     On or about July 25, 2007, defendants DANETTE THOMAS and

BYRON WHITE submitted and caused to be submitted fraudulent invoices for Unique Mgmt. to

JPMCB for real estate services in the amount of $59,850.48 and other settlement charges, for a

total of approximately $71,377.

(9)     On or about July 25, 2007, defendants SILVER BUCKMAN,

DANETTE THOMAS and BYRON WHITE caused JPMCB to wire transfer $304,464.23 from a

JPMCB operating account in Ohio to Trinity's bank account in New Jersey to be used for the

settlement on 16 Whiting Street.

(10)     On or about July 25, 2007, defendants SILVER BUCKMAN,

DANETTE THOMAS and BYRON WHITE caused the HUD-1 that would later be submitted to

JPMCB to falsely represent that D.T. supplied $14,990 of her own funds for the down payment

and that W.C. received $30,351.58 as proceeds from the settlement.

21

(11)     On or about July 25, 2007, defendants SILVER BUCKMAN, DANETTE THOMAS and BYRON WHITE caused D.T. to falsely represent on an "Occupancy Acknowledgement" form required by JPMCB that D.T. would occupy 16 Whiting Street as her primary residence "within 60 days of the closing and continue to occupy the property as my primary residence for at least one year."

(12)     On or about July 25, 2007, defendants DANETTE THOMAS and BYRON WHITE concealed from JPMCB that, in her capacity as the title agent for the settlement, defendant DANETTE THOMAS divided the $30,351.68 due W.C., issued a $315.96 check to W.C., and transferred the remaining $30,035.72 to her and defendant WHITE's Unique Mgmt. account.

(13)     On or about July 25, 2007, defendants DANETTE THOMAS and BYRON WHITE converted approximately $100,000 of the loan proceeds to their own use.  The defendants wired $16,000 to D.T. for being the "straw borrower," repaid $16,000 to defendant SILVER BUCKMAN for the down payment, spent more than $51,000 on personal expenses, and made sporadic payments on the mortgage on 16 Whiting Street until August 2008.

**H.     2599 Friendship Street, Vineland, NJ**

(1)     In or about June 2007, defendant SILVER BUCKMAN engaged in conversations with L.G., who had declared bankruptcy and was having financial difficulties, about the lease buyback program.

(2)     On or about June 5, 2007, defendant SILVER BUCKMAN induced L.G. to execute a lease buyback agreement which indicated that L.G. would share title with defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

(3)     On or about August 21, 2007, defendants SILVER BUCKMAN,

22

VINCENT FOXWORTH and CYNTHIA FOXWORTH caused a loan application to be submitted to JPMCB in which the defendants did not identify the existence of the lease buyback agreement, but did falsely represent that defendant VINCENT FOXWORTH had monthly employment income of $15,000 and other income for a total monthly income of $24,774.04. The defendants also falsely represented that defendant CYNTHIA FOXWORTH had monthly employment income of $7,500.

(4)     On or about September 5, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused JPMCB to wire transfer $186,315.88 from New York to Trinity's bank in New Jersey for the settlement on 2599 Friendship Street.

(5)     On or about September 5, 2007, defendant SILVER BUCKMAN withdrew $5,200 from the FSFS bank account.

(6)     On or about September 5, 2007, defendant SILVER BUCKMAN handled the settlement that took place at Trinity's office and obtained L.G.'s signature on a number of documents without explanation, including a new lease buyback agreement which no longer contained language about L.G. sharing title to her home with defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

(7)     On or about September 5, 2007, defendant SILVER BUCKMAN falsely represented to L.G. that $10,000 of the loan proceeds would be placed into an escrow account to help L.G. refinance her house at the end of the year encompassing the lease buyback program.

(8)     On or about September 5, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused the HUD-1 that would later be

23

supplied to JPMCB to indicate that defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH provided $25,165.75 of their own funds for the down payment at the settlement.

(9)      On or about September 5, 2007, defendant SILVER BUCKMAN caused the HUD-1 that would later be supplied to JPMCB to falsely misrepresent that L.G. received a settlement disbursement check in the amount of $45,247.95.

(10)      On or about September 5, 2007, defendant SILVER BUCKMAN converted approximately $45,247.95 of the loan proceeds to her own use.  Defendant BUCKMAN endorsed the check made payable to L.G., deposited the check into her FSFS bank, and commingled the proceeds with proceeds of other settlements that were part of the lease buyback program.

I.      **95 Featherbed Lane, Stockton, NJ**

(1)      On or about July 10, 2007, defendant SILVER BUCKMAN induced W.P. and K.P. to agree to a lease buyback and a contract for the sale of their home to defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH.

(2)      On or about August 7, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused a loan application for a $283,500 loan for the purchase of 95 Featherbed Lane to be submitted to JPMCB.  The defendants did not identify the existence of the lease buyback agreement, but did falsely represent that defendant VINCENT FOXWORTH had monthly employment income of $4,000 and monthly rental income of $15,100.  The defendants also falsely represented that defendant CYNTHIA FOXWORTH had monthly employment income of $4,000.

(3)      On or about September 20, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused JPMCB to wire

transfer approximately $279,016.13 from New York to Trinity's bank in New Jersey for the settlement on 95 Featherbed Lane.

(4)     On or about September 20, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH and CYNTHIA FOXWORTH caused the HUD-1 that would later be supplied to JPMCB to fraudulently indicate that W.P. and K.P. were responsible for $72,165.64 in settlement charges and were not entitled to or due any proceeds from the settlement.

(5)     On or about September 24, 2007, defendant SILVER BUCKMAN fraudulently caused the title agent to provide her with a settlement disbursement check made payable to "Fresh Start Financial Services" in the amount of $66,617.16, which defendant BUCKMAN converted to her own use.  Defendant BUCKMAN commingled the proceeds of the check with the proceeds of other settlements that resulted from the lease buyback program, wrote a $36,000 check payable to defendant VINCENT FOXWORTH and only five mortgage payments totaling $14,901.80 for the mortgage obtained on 95 Featherbed Lane.

**J.      1611 Swain Street, Philadelphia, PA**

(1)     In or about September 2007, defendants SILVER BUCKMAN, DANETTE THOMAS and BYRON WHITE engaged in conversations with M.B. about the lease buyback program and convinced M.B. that the program would provide her with the monies that she needed by cashing in some of her home equity.

(2)     In or about October 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS and BYRON WHITE submitted and caused to be submitted a loan application to Superior Mortgage that falsely represented defendant CYNTHIA FOXWORTH's monthly income and that the source of the

down payment and settlement costs would be from her checking and savings accounts.  The loan

application falsely represented that defendant CYNTHIA FOXWORTH had monthly earnings

totaling $19,500, including $7,500 from her teaching position and $12,500 from a tutoring

company.  The application also falsely represented that defendant CYNTHIA FOXWORTH

earned rental income.

        (3)     On or about October 19, 2007, defendant SILVER BUCKMAN

submitted and caused to be submitted a fraudulent $99,256.89 invoice for real estate services to

Superior Mortgage and Access Abstract Corporation ("AAC").

        (4)     On or about October 19, 2007, defendant DANETTE THOMAS

submitted and caused to be submitted a fraudulent $67,517.37 invoice for "Professional

Services" to Superior Mortgage and AAC.

        (5)     On or about October 19, 2007, defendants SILVER BUCKMAN,

VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS and BYRON

WHITE caused Superior Mortgage to wire transfer funds in the amount of $343,632.86 from

Hammonton, NJ to AAC's bank account in Folsom, PA for the settlement on 1611 Swain Street.

        (5)     On or about October 19, 2007, defendants SILVER BUCKMAN,

VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS and BYRON

WHITE attended the settlement at M.B.'s home.  At the settlement, the defendants caused the

HUD-1 to falsely represent that defendant CYNTHIA FOXWORTH had provided a $24,077.39

down payment from her own sources at the settlement and a $20,000 earnest money deposit prior

to the settlement.  The defendants caused the HUD-1 to falsely represent that defendant

BUCKMAN had provided real estate services that justified a disbursement of $99,256.89.  The

defendants caused the HUD-1 to falsely represent that defendants THOMAS and WHITE had

provided or were going to provide "Professional Services" that justified a disbursement of $67,517.37.

(6)     On or about October 19, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS and BYRON WHITE fraudulently caused AAC to wire transfer $67,517.37 of the loan proceeds from AAC's bank account in Folsom, PA to defendant THOMAS' Unique Mgmt. bank account in Pennsauken, NJ.

(7)     On or about October 19, 2007, defendants SILVER BUCKMAN, VINCENT FOXWORTH, CYNTHIA FOXWORTH, DANETTE THOMAS and BYRON WHITE fraudulently caused AAC to wire transfer $99,256.99 of the loan proceeds from AAC's bank account in Folsom, PA to defendant BUCKMAN's FSFS bank account in New Jersey. Following the receipt of the wire transfer, defendant BUCKMAN refunded $24,077.39 paid by defendants VINCENT FOXWORTH and CYNTHIA FOXWORTH for the down payment and another $20,000.  Defendant BUCKMAN made only two payments with the remaining loan proceeds toward the mortgage on the 1611 Swain Street property.

### K.     1629 S. 19th Street, Philadelphia, PA

(1)     In or about September 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI engaged in a series of telephone communications with E.H. about the lease buyback program.

(2)     On or about September 24, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI convinced E.H. to execute a lease buyback agreement and contract for the sale of real estate.

(3)     On or about October 26, 2007, defendant SILVER BUCKMAN

recruited her cousin, D.W., to be a "straw borrower" in a lease buyback agreement with E.H. and promised her $10,000.  Defendant BUCKMAN told D.W. that she would not have to put any money into the purchase of E.H.'s property.

(4)     On or about October 26, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a loan application to be submitted to Sovereign Bank on D.W.'s behalf that falsely represented D.W.'s profession and her income.  The loan application also falsely represented that D.W. would be providing $18,910.9 toward the down payment at the time of the settlement.

(6)     On or about October 26, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Sovereign Bank to approve two invoices for alleged services performed for E.H.  One invoice for $61,404.59 falsely represented to Sovereign Bank that FSFS provided real estate services to E.H.  The other invoice for $14,360.09 falsely represented to Sovereign Bank that defendant BUSI's company, HMD, provided painting, furniture, new floors, landscaping, and cleanup for E.H.

(7)     On or about October 26, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Sovereign Bank to approve the loan application and to wire transfer $125,308.50 from Reading, PA to AAC's bank account in Folsom, PA for the 1629 S. 19th Street settlement and payment of the invoices.

(8)     On or about October 26, 2007, defendant SILVER BUCKMAN withdrew $20,614.50 from her FSFS bank account and supplied the monies to D.W. for purposes of the settlement.

(9)     On or about October 26, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused AAC's title agent to prepare a HUD-1 that would later be

submitted to Sovereign Bank which falsely represented that D.W. had contributed $20,614.50 in cash to the settlement for the down payment and further falsely represented that D.W. had previously provided $1,000 in deposit or earnest money to E.H.  The defendants also cause the HUD-1 to falsely represent that E.H. received $48,259.18 from the sale of the 1629 S. 19th Street property.

(10)     On or about October 26, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused AAC's title agent to issue settlement disbursement checks for $61,404.59 to FSFS and for $14,360.09 to HMD.

(11)     On or about October 26, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI deposited their disbursement checks into their respective accounts.  From the $61,404.59 defendant BUCKMAN deposited into her FSFS bank account, she paid D.W. $10,000 and only six payments toward the mortgage on E.H.'s property.  She used the remaining proceeds for personal expenses, to make mortgage payments on other existing lease buyback transactions and to facilitate subsequent lease buyback transactions.

**L.     23 Church Street, Glassboro, NJ**

(1)     In or about September 2007, defendant FRANKLIN BUSI induced M.M. to execute a lease buyback agreement and agreement of sale of his home.

(2)     In or about September 2007, defendant SILVER BUCKMAN recruited her uncle, D.F., to be a "straw borrower" in a lease buyback agreement with M.M.

(3)     On or about October 9, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a loan application to be submitted to Lincoln Mortgage Co. in Conshohocken, PA on D.F.'s behalf that falsely represented D.F.'s profession and his income. The loan application also falsely represented that the source of the down payment, settlement

charges and/or subordinate financing would be D.F.'s checking account, a seller assist, and a deposit on the sales contract.  Defendant BUCKMAN forged D.F.'s initials and signature on the loan application.

(4)	On or about November 5, 2007, defendant SILVER BUCKMAN falsely represented in a letter that she caused to be submitted to Lincoln Mortgage Co. that D.F. was the owner of an HVAC business and had a monthly income of $6,000.

(5)	On or about December 14, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Lincoln Mortgage Co. to wire transfer $180,697.76 from their Firstrust Savings Bank in Conshohocken, PA to Trinity's Commerce Bank account in New Jersey for the settlement.

(6)	On or about December 14, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI obtained a $29,000 check from defendant VINCENT FOXWORTH for the down payment.

(7)	On or about December 14, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to prepare a HUD-1 that would later be submitted to Lincoln Mortgage Co. that falsely represented that D.F. attended the settlement, brought $28,768.16 to the settlement for the down payment, and executed the HUD-1.

(8)	On or about December 14, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Lincoln Mortgage Co. to approve a $62,000  invoice that falsely represented that HMD provided home repairs to the 23 Church Street property.

(9)	On or about December 14, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to issue a settlement disbursement check for $62,000.  Defendant BUSI deposited the check into his HMD account on or about December 17,

2007 and wrote a check payable to FSFS for $57,289.08. Defendant BUSI wrote at least two checks to himself totaling $2,500 with the remaining proceeds. Defendant BUCKMAN deposited the $57,289.08 check into the FSFS bank account, commingled the proceeds of the check with the proceeds of prior lease buyback transactions, repaid $29,000 to defendant VINCENT FOXWORTH, paid D.F. $5,000 for agreeing to be the "straw borrower," paid mortgages on other lease buyback transactions, and paid unrelated personal and business expenses.

(10)   On or about December 14, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI enabled M.M. to obtain only $496.43 from the settlement.

**M.**   **7335 Romeo Drive, Pennsauken, NJ**

(1)   In or about October 2007, defendant SILVER BUCKMAN induced D.R. to execute a lease buyback agreement.

(2)   In or about October 2007, defendant SILVER BUCKMAN recruited her aunt, D.F., to be a "straw borrower" in a lease buyback agreement with D.R. Defendant BUCKMAN forged D.F.'s signature on the lease buyback agreement.

(3)   On or about October 9, 2007, defendant SILVER BUCKMAN caused a loan application to be submitted to Countrywide Home Loans on D.F.'s behalf that falsely represented D.F.'s profession and her income. The loan application also falsely represented that the source of the down payment, settlement charges and/or subordinate financing would be D.F.'s checking account, a seller assist, and a deposit on the sales contract. Defendant BUCKMAN forged D.F.'s initials and signature on the loan application.

(4)   On or about December 28, 2007, defendant SILVER BUCKMAN caused a final version of the loan application to be submitted to Countrywide Home Loans that

31

falsely represented that D.F.'s monthly income was $12,000, that D.F. had given D.R. earnest money totaling $20,000, and that D.F. was providing $13,746.53 as a down payment.  Defendant BUCKMAN forged D.F.'s initials and signature on the loan application.

(5)     On or about December 28, 2007, defendant SILVER BUCKMAN caused Countrywide Home Loans to wire transfer $157,296.19 from their New York account to Trinity's account in New Jersey for the settlement.

(6)     On or about December 28, 2007, defendant SILVER BUCKMAN withdrew $11,804.79 from the FSFS, obtained a $11,804.79 Wachovia bank check, and presented the Wachovia Bank check to defendant DANETTE THOMAS as the title agent for the settlement.

(7)     On or about December 28, 2007, defendants SILVER BUCKMAN and DANETTE THOMAS caused the preparation of a HUD-1 that would later be submitted to Countrywide Home Loans that falsely represented that D.F. attended the settlement, brought $11,804.79 to the settlement for the down payment, and executed the HUD-1.

(8)     On or about December 28, 2007, defendant DANETTE THOMAS wire transferred $51,133.05 of the loan proceeds due D.R. to defendant FRANKLIN BUSI's HMD account.

(9)     On or about December 28, 2007, defendant FRANKLIN BUSI wrote a check from his HMD account payable to FSFS for the entire $51,133.05.

(10)     On or about December 28, 2007, defendant SILVER BUCKMAN deposited the $51,133.05 check she received from defendant FRANKLIN BUSI into her FSFS bank account and commingled the proceeds of the 7335 Romeo Drive transaction with the proceeds of other lease buyback transactions.  Later, defendant BUCKMAN used the

commingled proceeds to make payments on other lease buyback mortgages, down payments on other transactions, and on unrelated personal and business expenses.

(11)     On or about December 28, 2007, defendant DANETTE THOMAS transferred $24,675.29 of the remaining proceeds from the Trinity account to her Unique Mgmt. account.

(12)     On or about December 28, 2007, defendants SILVER BUCKMAN, FRANKLIN BUSI and DANETTE THOMAS allowed D.R. to receive a transfer from Trinity's account of only $5,000.13.

### N.      13 Woodlawn Avenue, Jersey City, NJ

(1)     In or about December 2007, defendant SILVER BUCKMAN induced D.E. to execute a lease buyback agreement.

(2)     In or about December 2007, defendant SILVER BUCKMAN recruited her uncle, D.F., to be a "straw borrower" in a lease buyback agreement with D.E. or fraudulently used her uncle's identity.  Defendant BUCKMAN forged D.F.'s signature on the lease buyback agreement.

(3)     In or about December 2007, defendant FRANKLIN BUSI caused a loan application to be submitted to Freedom Mortgage (Mt. Laurel, NJ) on D.F.'s behalf that falsely represented D.F.'s profession and his income.  The loan application also falsely represented that the source of the down payment, settlement charges and/or subordinate financing would be D.F.'s checking account, a seller assist, and a deposit on the sales contract. D.F.'s initials and signature were forged on the loan application.

(4)     On or about January 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Freedom Mortgage to agree to fund the requested loan and to

wire $313,415.07 to Trinity for the settlement.

(5)     On or about January 3, 2008, defendant SILVER BUCKMAN withdrew $26,236.77 from the FSFS account that contained the commingled funds from the D.R. and M.M. lease buyback transactions, then wrote a $26,236.77 check and obtained some additional monies for the down payment.  Defendant VINCENT FOXWORTH added a $15,000 and a $10,000 check to the monies that defendant BUCKMAN provided for the down payment.

(6)     On or about January 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to prepare a HUD-1 that would later be submitted to Freedom Mortgage that falsely represented that D.F. attended the settlement, brought $51,236.77 to the settlement for the down payment, and executed the HUD-1.

(7)     On or about January 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to prepare a HUD-1 that would later be submitted to Freedom Mortgage that also falsely represented that the total settlement charges due from the seller, D.E., were $122,924.77, including a disbursement for $116,000 for Dana Capital for "Services Rendered."

(8)     On or about January 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to wire $116,000 of the loan proceeds to defendant BUCKMAN's Dana Capital bank account.  Defendant BUCKMAN transferred $30,000 of the loan proceeds from the Dana Capital bank account to the FSFS and used the proceeds to pay other mortgages resulting from the lease buyback program, to make the down payment on a subsequent lease buyback transaction, and her personal expenses.

(9)     On or about January 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to prepare a $5,870.72 disbursement check

34

made payable to D.E.  Defendant BUSI deposited the $5,870.72 check into his HMD account for his personal use.

### O.     34 Long Street, Jersey City, NJ

(1)     On or about November 28, 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused E.G. to agree to execute a lease buyback agreement.

(2)     In or about December 2007, defendant SILVER BUCKMAN recruited her aunt, D.F., to be a "straw borrower" in a lease buyback agreement with E.G. or fraudulently used her aunt's identity.  Defendant BUCKMAN forged D.F.'s signature on the lease buyback agreement.

(3)     In or about December 2007, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a loan application to be submitted to Assured Lending (Mt. Laurel, NJ) on D.F.'s behalf that falsely represented D.F.'s profession and her income.  The loan application also falsely represented that the source of the down payment, settlement charges and/or subordinate financing would be D.F.'s checking account and a seller assist.  D.F.'s initials and signature were forged on the loan application.

(4)     On or about January 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a final version of the loan application to be submitted to Assured Lending that falsely represented that D.F.'s monthly income was $12,000.  The defendants also falsely represented that D.F. was relying on her checking and savings accounts and a seller assist for the down payment and closing costs.  D.F.'s initials and signature were forged on the loan application.

(5)     On or about January 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Assured Lending to agree to fund the requested loan and to wire

$316,204.42 from New Jersey to AAC's account in Folsom, PA for the settlement.

(6)     On or about January 8, 2008, defendant SILVER BUCKMAN withdrew $42,261.23 from her Dana Capital bank account that contained the commingled funds from the E.G. lease buyback transaction and supplied $42,261.23 for the down payment on the 34 Long Street settlement.

(7)     On or about January 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to prepare a HUD-1 that would later be submitted to Assured Lending that falsely represented that D.F. attended the settlement, brought $42,261.23 to the settlement for the down payment, and executed the HUD-1.

(8)     On or about January 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to prepare a HUD-1 that would later be submitted to Assured Lending that also falsely represented that defendant BUSI was entitled to a disbursement of $82,059.90 based on an HMD invoice for "Real Estate Services Rendered."

(9)     On or about January 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the Trinity title agent to wire $82,059.90 to HMD's bank account. Following receipt of the transferred funds, defendant BUSI wrote a $75,250 check payable to FSFS and retained $6,809 for his personal use.  Defendant BUCKMAN deposited the $75,250 check into her FSFS bank account, commingled the monies with the proceeds of the D.E. transaction, and used the funds to mortgages on other lease buyback transactions, and her personal expenses.  Defendant BUCKMAN paid less than $8,000 on the mortgage for 34 Long Street.

(10)     On or about January 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused E.G. to receive only $10,500.09 from the settlement.

P.      **515 Arthur Avenue, Glassboro, NJ**

(1)      In or about March 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused E.P. to agree to execute a lease buyback agreement.

(2)      In or about March 2008, defendant SILVER BUCKMAN recruited R.N. to be a "straw borrower" in a lease buyback agreement with E.P. for $10,000.  Defendant BUCKMAN told R.N. he would not have to use any of his own monies for the transaction.

(3)      On or about March 20, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a loan application to be submitted to EverBank on R.N.'s behalf that falsely represented that R.N. intended 515 Arthur Avenue to be R.N.'s primary residence. The loan application also falsely represented that the source of the down payment, settlement charges and/or subordinate financing would be R.N.'s checking and savings accounts.  R.N.'s initials and signature were forged on the loan application.

(4)      On or about April 2, 2008, defendant SILVER BUCKMAN withdrew approximately $22,000 from the FSFS bank account and supplied the monies to R.N. for the settlement.

(5)      On or about April 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a final version of the loan application to be submitted to EverBank that again falsely represented that R.N. intended 515 Arthur Avenue to be R.N.'s primary residence and that R.N.'s checking and savings accounts were the source of the down payment and settlement charges.

(6)      On or about April 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused EverBank to agree to fund the requested loan and to wire $189,730.62 from Jacksonville, FL to AAC's account in Folsom, PA for the settlement.

37

(7)     On or about April 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the AAC title agent to prepare a HUD-1 that would later be submitted to EverBank that falsely represented that R.N. provided $22,154.01 of his own funds for the down payment and E.P. received $66,549.89.

(8)     On or about April 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused R.N. to execute a "Borrower's Closing Affidavit," in which R.N. falsely represented that 515 Arthur Avenue would be R.N.'s primary residence.

(9)     On or about April 3, 2008, defendant SILVER BUCKMAN forged Pace's signature on a $66,549.89 settlement disbursement check and deposited the proceeds into her FSFS bank account.  The proceeds were commingled with the remaining proceeds of other lease buyback agreements.  Defendant BUCKMAN used the proceeds to repay monies to defendant VINCENT FOXWORTH, make payments on other mortgages, and paid other business and personal expenses.

(10)    On or about April 3, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused E.P. to receive no monies from the settlement.

(11)    In or about 2008, defendant SILVER BUCKMAN caused only one payment to be made on the mortgage obtained from EverBank for 515 Arthur Avenue from the $66,549.89 received from the settlement.

**Q.      8334 Michener Avenue, Philadelphia, PA**

(1)     On or about January 28, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused O.B. and R.B. to execute a lease buyback agreement and sales contract for the sale of their home to R.N.

(2)     On or about January 28, 2008, defendant SILVER BUCKMAN

38

fraudulently used R.N.'s identity and forged R.N.'s initials and signature in a lease buyback agreement and agreement for sale.

(3)     On or about April 1, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a loan application that fraudulently used R.N.'s identity and falsely represented that R.N. 8334 Michener Avenue to be his primary residence to be submitted to JPMCB.

(4)     On or about April 18, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused JPMCB to wire transfer $141,870.76 from North Carolina to AAC's bank account in Folsom, PA for the settlement on 8334 Michener Avenue.

(5)     On or about April 18, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the AAC title agent to prepare a HUD-1 that would later be submitted to JPMCB that falsely represented that R.N. attended the settlement, brought $9,067.84 to the settlement for the down payment, and executed the HUD-1.

(6)     On or about April 18, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the AAC title agent to prepare a HUD-1 that would later be submitted to JPMCB that falsely represented that O.B. and R.B. received $47,831.92 at the settlement.

(7)     On or about April 18, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused JPMCB to receive a fraudulently executed document that represented R.N. would occupy 8335 Michener Avenue within 60 days of the April 18, 2008 settlement.

(8)     On or about April 18, 2008, defendant SILVER BUCKMAN forged O.B.'s signature on a $47,831.92 settlement disbursement check and deposited the proceeds into her Dana Capital bank account.  Defendant BUCKMAN provided $11,253.26 of the proceeds of the check to defendant VINCENT FOXWORTH and used the remainder for

personal and business expenses; none of the proceeds were used to pay the mortgage on 8335 Michener Avenue.

### R.   6721 Radcliffe Street, Bristol, PA

(1)     In or about April 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI induced J.H. to enter into a lease buyback agreement and agreement for the sale of her home to R.N.

(2)     In or about April 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI fraudulently used R.N.'s identity and forged R.N.'s initials and signature in a lease buyback agreement and agreement for sale.

(3)     On or about April 8, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused a loan application that fraudulently used R.N.'s identity and falsely represented that R.N. 6721 Radcliffe Street to be his primary residence to be submitted to Freedom Mortgage.

(4)     On or about May 2, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused Freedom Mortgage to wire transfer $221,250.67 from New Jersey to AAC's bank account in Folsom, PA for the settlement on 6721 Radcliffe Street.

(5)     On or about May 2, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the AAC title agent to prepare a HUD-1 that would later be submitted to Freedom Mortgage that falsely represented that R.N. attended the settlement, brought $18,958.18 cash to the settlement for the down payment, and executed the HUD-1.

(6)     On or about May 2, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the AAC title agent to prepare a HUD-1 that would later be submitted to Freedom Mortgage that falsely represented that J.H. received $74,525.41 at the settlement,

when no such disbursement was made at the settlement or afterwards to J.H.

(7)     On or about April 18, 2008, defendants SILVER BUCKMAN and FRANKLIN BUSI caused the AAC title agent to provide a $76,395.70 check payable to J.H. to defendant BUCKMAN.

(8)     On or about April 18, 2008, defendant SILVER BUCKMAN provided J.H. a total of $10,000 from the settlement.

(9)     On or about May 7, 2008, defendant SILVER BUCKMAN forged J.H.'s name on a $76,395.70 settlement check and deposited the check into her Dana Capital bank account.  Defendant BUCKMAN used the proceeds of the check to make payments on other lease buyback mortgages, paid $21,958.18 to defendant VINCENT FOXWORTH, and made transfers to her personal account.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO AND THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

2.      On or about each of the dates reflected below for each of Counts Two and Three, within the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN**,
**VINCENT FOXWORTH**, and
**CYNTHIA FOXWORTH**

aided and abetted by each other and others known and unknown to the grand jury, knowingly executed and attempted to execute a scheme and artifice to defraud the financial institutions named in each of Counts Two and Three, whose deposits were then insured by the FDIC, and to obtain moneys, funds, and credits owned by and under the custody and control of said financial institutions by means of false and fraudulent pretenses and representations.

| | | | | |
|---|---|---|---|---|
| 2 | 12/18/2006 | 12 Tiffany Court Kunkletown, PA | $328,500 | Fremont |
| 3 | 4/11/2007 | 5219 N. 6th Street Philadelphia, PA | $75,784.56 | MLB&T |

All in violation of Title 18, United States Code, Sections 1344 and 2.

42

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

2.      On or about April 24, 2007, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN**,
**VINCENT FOXWORTH**,
**CYNTHIA FOXWORTH, and**
**DANETTE THOMAS**

aided and abetted by each other and others known and unknown to the grand jury, knowingly executed and attempted to execute a scheme and artifice to defraud Sovereign Bank, whose deposits were then insured by the FDIC, and to obtain moneys, funds, and credits owned by and under the custody and control of said financial institution, that is, approximately $208,637.25, by means of false and fraudulent pretenses and representations.

In violation of Title 18, United States Code, Sections 1344 and 2.

43

## COUNT FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

   1.  Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

   2.  On or about October 26, 2007, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN and
FRANKLIN BUSI**

aided and abetted by each other and others known and unknown to the grand jury, knowingly executed and attempted to execute a scheme and artifice to defraud Sovereign Bank, whose deposits were then insured by the FDIC, and to obtain moneys, funds, and credits owned by and under the custody and control of said financial institution, that is, approximately $125,308.50, by means of false and fraudulent pretenses and representations.

   In violation of Title 18, United States Code, Sections 1344 and 2.

## COUNTS SIX AND SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.    Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

      2.    On or about each of the dates reflected below for each of Counts Six and Seven, within the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN**,
**VINCENT FOXWORTH**, and
**FRANKLIN BUSI**

aided and abetted by each other and others known and unknown to the grand jury, knowingly executed and attempted to execute a scheme and artifice to defraud the financial institutions named in each of Counts Six and Seven, whose deposits were then insured by the FDIC, and to obtain moneys, funds, and credits owned by and under the custody and control of said financial institutions by means of false and fraudulent pretenses and representations.

| COUNT | HUD-1/LOAN APPL. DATE | ADDRESS | LOAN AMT. | BANK |
|---|---|---|---|---|
| 6 | 4/3/2008 | 515 Arthur Ave. Glassboro, NJ | $189,730.62 | EverBank |
| 7 | 4/18/2008 | 8334 Michener Ave. Philadelphia, PA | $141,870.76 | JPMCB |

All in violation of Title 18, United States Code, Sections 1344 and 2.

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.     Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

       2.     On or about April 11, 2007, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN**,
**VINCENT FOXWORTH**, and
**CYNTHIA FOXWORTH**

aided and abetted by each other and others known and unknown to the grand jury, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive L.C. of money and property, which scheme affected MLB&T, a federally insured financial institution, the defendant did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, the electronic fund transfer of $75,784.56 from Springfield, OH to North Wales, PA.

       In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

2.     On or about April 24, 2007, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN,**
**VINCENT FOXWORTH,**
**CYNTHIA FOXWORTH, and**
**DANETTE THOMAS**

aided and abetted by each other and others known and unknown to the grand jury, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive R.W. and M.W. of money and property, which scheme affected Sovereign Bank, a federally insured financial institution, the defendant did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, the electronic fund transfer of $208,637.25 from Reading, PA to Pennsauken, NJ.

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

        2.      On or about October 26, 2007, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN and**
**FRANKLIN BUSI**

aided and abetted by each other and others known and unknown to the grand jury, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive E.H. of money and property, which scheme affected Sovereign Bank, a federally insured financial institution, the defendant did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, the electronic fund transfer of invoices from New Jersey to Folsom, PA and Reading, PA for alleged services totaling $75,764.68 performed for E.H.

        In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT ELEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

2.     On or about April 3, 2008, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN**,
**VINCENT FOXWORTH**, and
**FRANKLIN BUSI**

aided and abetted by each other and others known and unknown to the grand jury, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive E.P. of money and property, which scheme affected EverBank, a federally insured financial institution, the defendant did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, the electronic fund transfer of $189,730.62 from Jacksonville, FL to Folsom, PA.

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWELVE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs 1 through 20 and 22 through 31 of Count One are realleged and incorporated herein by reference.

      2.     On or about April 18, 2008, in the Eastern District of Pennsylvania, and elsewhere, the defendants

**SILVER BUCKMAN**,
**VINCENT FOXWORTH**, and
**FRANKLIN BUSI**

aided and abetted by each other and others known and unknown to the grand jury, for the purpose of executing and attempting to execute the scheme and artifice to defraud and deprive O.B. and R.B. of money and property, which scheme affected JPMCB, a federally insured financial institution, the defendant did knowingly cause to be transmitted by wire communication in interstate commerce, writings, signs, signals, pictures and sounds, that is, the electronic fund transfer of $141,870.76 from North Carolina to Folsom, PA.

      In violation of Title 18, United States Code, Sections 1343 and 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Sections 1343, 1344 and 1349, as set forth in this indictment, defendants

**SILVER BUCKMAN**
**VINCENT FOXWORTH**
**CYNTHIA FOXWORTH**
**DANETTE THOMAS**
**BYRON WHITE and**
**FRANKLIN BUSI**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds obtained directly or indirectly from the commission of such offenses, including, but not limited to, the sum of $3,797,600.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a)      cannot be located upon the exercise of due diligence;

(b)      has been transferred or sold to, or deposited with, a third party;

(c)      has been placed beyond the jurisdiction of the Court;

(d)      has been substantially diminished in value; or

(e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), both incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

_____
**ZANE DAVID MEMEGER**
**UNITED STATES ATTORNEY**